Attorney General, U.S. Department of Justice. Mr. Goldstein for the appellant, Ms. Lyons for the applicant. Whenever you're ready, Mr. Goldstein. Good morning. My name is Jerry Goldstein. I represent the appellant, Tim Jeffries in this case. The case involves seven non-selections for GS-14 positions in the Bureau of Justice Assistance that Mr. Jeffries applied for between 2011 and 2014. And he contends that the non-selections were due to race and or sex discrimination or retaliation. The cases necessarily arose at different times over those three years and were parceled out to different EEOC offices around the country for processing. The EEOC wouldn't let us consolidate them, so the only efficient way to handle them was to put them together here and bring them as a single case in this court. Then the agency filed a motion for judgment on the pleadings or alternatively for summary judgment. Before there was an opportunity for us to take any discovery, we filed an opposition and a motion for relief under Rule 56D. The court denied both of those on November 15, 2016. We appealed the district court decision, and while that appeal was pending, I received an unsolicited email from the president of the local union that handles the OJP, Office of Justice Programs, employees, which contained allegations against an individual named Edison Aponte, who was the associate deputy director. We're familiar with the evidence of that. The question I have is partly just to clarify what we have before us now. Do you have evidence of racial discrimination or sex discrimination apart from the evidence of retaliation, or is the focus really of the case now on retaliation? I think it's more than retaliation because there was evidence that Mr. Aponte was engaged in sexual harassment in favoring some of the females that he preferred for these positions, which involved even giving them questions that were going to be asked in the interviews and saying he could help them get promoted within mere justice assistance. Mr. Goldstein, it seems that Mr. Jeffries does not meaningfully contest that the other employees who were selected instead of him were much more qualified. There doesn't seem to be any real evidence that that is untrue. The Department of Justice suggested that they were more qualified, and there doesn't seem to be any evidence of that. He was more qualified than the selectee in order to state a case of discrimination. There's other ways of proving discrimination. That's what we're left with here because there was no discovery. So that was how he went about showing, for example, the subjectivity of the scoring in places, the lack of notes to document what actually occurred in the interview processes, and so forth. So, yes, there is other evidence that we were able to gather that, despite lack of discovery, there was discrimination involved or could have been involved, apart from any evidence of was he better qualified or not. And then the thrust of the district court decision and of the agency's position is, as you say, that the selectees were better qualified, and they gave better interviews. But if they were given questions in advance and helped to prepare, yeah, sure, they would have been in a better position to answer the questions at an interview than Mr. Jeffries was. So I think that those factors all matter when you're considering what the agency's position in terms of qualifications of selectee versus qualifications of Mr. Jeffries is concerned. So... I mean, I don't think there's any dispute that it confers an entitlement to the holder to be considered before other candidates and, indeed, to be considered before other candidates are considered. And I see in the record where you pointed to evidence that that was not, in fact, he did. But further than that, is the entitlement that once the person is looked at, if they are qualified, they should be hired? Or that even a qualified person could just be passed over and put into the general pool? Well, the way it's supposed to work is that the person with priority consideration is supposed to be considered before other candidates. And that person is interviewed by the selecting official and gets a, is supposed to get a decision up or down before anybody else is considered. And does that mean before a slate is put together of other candidates or before that slate is given to the decision maker? Or do we have any reason to know the answer to that? Well, in this case, it's undisputed that the selecting official was never involved in the selection. It was the panel made the decision. And is that critical? I mean, if the panel is the, are the delegates of the selecting official, then, I mean, isn't the point that whoever's making the selection should do it on its own terms for the person with priority consideration? Or am I wrong about that? Well, in this case, the selection, the panel was there to make recommendations. And was not supposed to be considering other applicants. Right. I understand that's a little bit of a different point, though, from your point that the selecting official didn't interview him at all. So if we put aside whether the selecting official under priority consideration could, or could delegate to a panel, then your position is that that was, was Well, that's, according to the cases, that's not the way it's supposed to work. The cases say the selecting official is supposed to do the interview, even if that's not the agency's ordinary. And make a decision up or down on this person. And then they can go on and talk to whoever else they want to. Right. And your best case for that the selecting official is supposed to do it is which? That the selecting official rather than the delegates of the selecting official. Right. It's not even clear who the selecting official was in this case. But you say the case is made clear that the selecting official is important rather than the delegates of the selecting official. And I'm not aware of cases that actually treated that issue. So I was asking you what what case are you thinking of? The yeah, we cited. Yeah. One second. Perry versus Department of the Army and Pope. And is it your position that the that the defects in priority consideration are themselves also an adverse. Yes. Do you think that a failure to give priority consideration is categorically an adverse employment decision or that it's just an adverse employment decision in this context? I think it's it's whether in this context or not, I think it's considered an adverse employment action. Why isn't the failure to give priority consideration here more like the facts in Bridgeforth and Douglas versus Donovan? Bridgeforth was not a priority consideration case, as I recall. And the as opposed to, for example, Zervas and Singletary that we cited that were and where the in those cases, it was recognized to be an adverse action to failure to fail to follow priority considerations procedures. But I mean, Bridgeforth and Douglas are decisions of this Court. Well, Bridgeforth was involved a time off award. It was not a failure to follow priority considerations that the agency had already said it was going to follow. So that's why it's distinguishable from the cases we cited, Zervas and Singletary. Can I ask you, priority consideration applies to similar positions, right? Yes. And I didn't really see much of an explanation as to how or why this is a similar position than the position that the priority consideration applies to. In this case, the agency agreed to use priority consideration for making the selection. So it was kind of a given at the very start of the process for the selection for this position. This is the 2011 position you're talking about? The first one. So your view is that you didn't need to show any similarity because the agency conceded that? Right. They said they were going to follow it for them as part of the process. Thank you. Morning, Ms. Lyons. Good morning. May it please the Court. Jane Lyons on behalf of the Department of Justice. I'd like to pick up where the Court's been just discussing the priority consideration issues in this case. First of all, the priority consideration cases on which my friend on the other side relies are priority consideration from different agencies. The agency in this case, the Department of Justice, has a policy, its merit promotion policy, has some priorities. And it is important to understand that it's priority consideration, it is not guaranteed placement. So in response to the question of what do you get, you get, when it's normally being applied, you get first interview and a decision up or down on your candidacy before more things happen. And that doesn't seem to be disputed, at least that far. Failey himself says that the priority consideration candidate needed to be considered and a decision reached before receiving information on or interviewing anyone else. The problem here, of course, is that, as Judge Wilkins' question just alluded to, the system works when the HR department identifies a vacancy open, they're about to announce, and they've identified a vacancy that's sufficiently similar, and then they can give the priority consideration in the ordinary course. That's not what happened here. Right. In fact, this job was open, and the candidate was wondering, Mr. Jeffries was wondering why he wasn't given priority consideration for it. Well, he asked. He asked about the priority consideration and whether he could use it. There was no dispute about whether the position was similar, but that doesn't mean the agency conceded its similarity. The agency simply said, if you want to have priority consideration, we will do that the best we can under the circumstances that we have. And that is exactly what happened. So it would be unfair, unusual to say that granting his request to get priority consideration and introducing the sort of procedural regularity to the extent that there's any, and it's a small delta. The process hasn't gotten very far along at the time Mr. Jeffries is interviewed by the panel, and given his decision that he is not going to get the position through priority consideration. And they go on with the process. And he claims and points to evidence, notwithstanding the lack of discovery, that someone else was, in fact, interviewed before he was. And the panelists themselves seem to acknowledge that they received information about other candidates before they made the decision on him and, in fact, that they compared him with the other candidates, which I gather in your understanding of how priority consideration ordinarily works is not kosher. For lack of a better term, it would, generally speaking, not be kosher because it would be following a different process. But to the extent these are small, irregular procedural irregularities, they're introduced by Mr. Jeffries himself, and... So what's your position on whether the record, in fact, shows that others were considered, at least their paper applications and qualifications were considered along with, before a decision was actually made finally on Jeffries? My position on the record on that is that the record does not support that. Notwithstanding that the panelists themselves said that they compared his qualifications. The panelists say they're basically, I think those statements are best construed in the light most favorable to Jeffries to acknowledge that they're aware of other applicants and who the other applicants are. Let's face it, this is not a big agency. They know these people. So they know who's available, perhaps. They don't they haven't said they've sat down and gone through or graded their applications. The facts are not strong. And... They're making comparisons and then there's categorical denial that they've made comparisons. Yes. There's some of both. And he points to that. And it's your position that he's not entitled to any discovery into any of that. My position is that there is that any discovery into that wouldn't change the outcome because it doesn't cast doubt ultimately on the material facts, which is how did he do in the interview that he gave. He doesn't offer a contrary narrative that he did a great job and blew that interview out of the park and that he deserved the job. He doesn't make that claim. It's a little premature for him to offer a narrative when he hasn't had an opportunity to cross-examine the decision-making officials. I'm not aware of any employment discrimination case in which zero federal court discovery was authorized. 56D requests an outline for discovery was offered and the district court denied it and we upheld it. Are you? And I'm not talking about marginal further discovery that someone requests, but we're out of the box. There's no Rule 26F discovery conference. There's no mandatory initial disclosures. There's no discussion with the district court what the discovery plan should be. And there's a motion filed, plaintiff says, wait, I haven't had the most basic information about cross-examining these very people who I named as defendants before in an EEO complaint. I think maybe they might have a retaliatory motive against me. And instead, the district court says, oh, but prima facie, what they say is reasonable. Sorry, no discovery. Is that any case that we've ever decided that's close to that? Yes, Your Honor. I'm not certain that there's absolutely no discovery, but I would point the court to Dunning v. Wander in 2007, in which, and then that case cites Strang v. U.S. Arms Control and Disarmament Agency from 1989, which saying that the desire to test or elaborate with the decision-makers about their reasons in a vague way is not enough to require discovery without reason to question their veracity. And here, we don't have a reason to question veracity, because he doesn't say he did an outstanding job in the interview. So let me make sure I understand your position. When you file a Rule 56D motion, you have to not just say, we are seeking information and discovery about the interview notes and other documentation and depositions about how the interviews went. You also have to attach a declaration saying that the interview went great, and I was perfect, in order to obtain relief. No, I wouldn't say it that way. What I would say is that the Rule 56D affidavit itself, describing what particular discovery needs to be adduced to be able to oppose summary judgment, has to be read in the context of the summary judgment opposition, which is filed simultaneously, and explains and identifies what the material facts of the case are through the way the case is being presented. But here, let me just tell you what I'm concerned about, so you can tell me why I shouldn't be concerned about it. The reasoning given for at least some of the selections, including the 2011 selection, is that he did do well in the interview. He took his jacket off, he seemed unprofessional, very subjective. And so at JA 890, I think it is, as part of the 56D motion, he says, you know, I want to take discovery because I want to basically find out, you know, from the notes, et cetera, kind of contemporaneous evidence about what happened during these, during my interviews and the other interviews. So I guess there were, he did get some information about his interview. There were some notes about his interview. But there's nothing that he received about the other interviews. For all we know, that the person who was selected, there's a note that says that they, you know, took off their jacket, too. So I guess the concern that I have is that when a very subjective reason is given as the legitimate nondiscriminatory reason, and it has to do with the nature of what happened during the interview, why is it too much to ask for the plaintiff to give me notes of all the interviews there? As an initial matter, Your Honor, I believe he does have the, at least the interviews of the successful candidates, Ms. Womack and Ms. Fulton-Jones, for that month's election. And with regard to the subjectivity of taking off the jacket, which was perceived to be unprofessional, that's only one of several reasons that the June 2011 memo and the July 29 letter to Mr. Jeffries explained. And the other reasons are more concrete, if you will. He gave incomplete or insufficient answers to demonstrate the ability to do the job. He introduced a written document into the process. He brought it in. It wasn't a writing sample, per se, but he brought it in. And it had some grammatical or spelling errors that were less than professional. So those are more concrete reasons. And Ms. Reed, who was on the interview panel, said his interview lacked depth, and it was solely focused on work with the drug courts program, and didn't translate into the full range of skills needed to manage state policy advisors. She said he never mentioned any of his grants experience, and this is a supervisory grant program manager position. So it goes well beyond the unprofessional attire issue that I would agree is somewhat subjective. And if it were only that, it would be one thing. This is very much not that case. So you mentioned Dunning v. Quandor. I think the other case you mentioned was a FOIA case. It's a Title VII case in which discovery was not allowed. But I don't think that there was a Rule 56, it was F at that time, affidavit filed at all. The plaintiff forfeited the right to seek discovery in that case, and here we have a very different situation. I mean, if you just zoom out and think about it, the plaintiff has a burden in this area of law to prove the motive of the defendant's agents. Yes, Your Honor. That's ultimately true. Right. But in this case ---- And here we have, unlike many of the areas of law that this Court deals with, where we routinely get threshold cross motions for summary judgment on an administrative record, that's not the administrative scheme we have here, right? We have de novo responsibility to develop the case in the Federal Court. Yes, but that is after an exhaustion process in this case that resulted in the provision of hundreds of pages of documents. There's no dispute, however, that there were no depositions taken, and that the key issue is whether these deciding officials, recommending officials, were acting in a retaliatory manner. And we don't have much because they haven't been deposed. What we do know is that two of them were the very ---- were among the people that he had named not so long ago in an EEO complaint that was resolved. And we know that later there was some pretty unprofessional e-mail exchange among various supervisory officials laughing about the prospect that this individual would be promoted in the agency. We also know, and there's not a connection drawn, because there hasn't been an opportunity to ask anybody whether they talked to Mr. Jeffries because ---- and it was tied to his race and the fact that she didn't think that he had been qualified in the first place. So we don't know whether this is all going to add up. And, indeed, in other cases where discovery is allowed, where we've remanded for discovery under 5060, in the end the defendant prevails. But as a matter of process, I'm just ---- I want to hear your best defense of why that process isn't just contrary to the sort of the basics of how we run a case in the Federal Court. I'm happy to respond. There were a lot of parts to that question, so I'm going to need a little time. As a principle matter, my answer is Rule 56 of the Federal Rules of Civil Procedure places the district court in the function of having to decide that issue, whether discovery is warranted, that gives the court the ability to decide the issue, and it tells it how to do it. And that's a point that was made as sort of the fundamental answer to your ---- the most basic answer to your question. That was made in Strang v. U.S. Arms Control in that case. And in that case, again, the court said, failing to say concretely why ---- well, I don't want to talk about Strang. In these Title VII cases ---- That's not what we have here. We have a lawyer explaining what anybody who's litigated any of these cases knows, which is that you need to probe the stated reasons. You need an opportunity to probe that. And this plaintiff has had zero opportunity, and I think has done the outlining that Rule 56d requires of how that might go forward. I respectfully disagree, Your Honor. The 56d affidavit in this case is generic to any Title VII case with any kinds of adverse actions, and the kind of boilerplate language does not meet the standard in Convertino to identify with particularity what facts are there and why they aren't available, yet no discovery has ---- I mean, no depositions were taken, but sworn statements were given. And this Court's decision in Dunning says basically the hope for a Perry Mason moment during those depositions and the recreation of the moment-by-moment, play-by-play is not necessary and summary judgment can be entered in cases with less than that record. And that's also another case made in Richard and in Smith. And I would point out that we cited all these cases in our argument, in our brief, and the appellate made no response to those arguments in his reply. So under Taylor v. FDIC, the Court could deem that issue conceded. Obviously, the questioning of the panel doesn't suggest it would, but it could. And Convertino, the only case on which they rely, is a very different situation. I'm not going to get into it with my red light on, but if I could briefly respond to some of the other things you said, Judge Pillard. The knowledge alone of the officials and many of the officials involved in these applications were aware of Mr. Jeffrey's prior protected activity. But Jones v. Bernanke says that's not enough by itself to get you on to past summary judgment. The joking e-mail, unprofessional, I think, was your word. I called it the joke e-mail between Mr. Troutman and Mr. Farley. I always want to call him Farley, but it's Faley. Farley is an isolated incident. It has nothing to do with any of this. It's a moment of levity. It doesn't refer to his protected activity or his gender or his race. It would be too much to place any kind of inference on that. And as for Ms. Ball and this, what you call the campaign to get rid of Mr. Jeffreys, I think that's a little strong in light of the evidence. But Ms. Ball played absolutely no role in any of these selections. So, again, not enough to create a genuine dispute of material fact, even if everything Mr. Jeffreys wanted to get in discovery turned out just the way he hoped. Well, if it turned out just the way he hoped, he would have plenty of material to find. Well, sure. I mean, we can't anticipate direct evidence and admission, I don't think, reasonably. We can't. We can't. If there are no further questions, I would ask that the judgment be affirmed. Thank you. Thank you. Mr. Goldstein, you've used your time, but we'll give you a couple of minutes for a rebuttal. I'll make it quick. Thank you. Just a few points. The priority consideration in the BJA's own regulation speaks directly to consideration by the selecting official. It's not just in the couple of cases that we cited as the standard procedures that all agencies follow. We also noted in our brief that the agency cited something like 20 cases where summary judgment had been granted to the employer. But in essentially all those cases, the plaintiff had gotten discovery, even though it may have ultimately lost on summary judgment. It's just the norm of the way these cases are handled, especially because the documents are usually in the possession of the employer. You need discovery to get them. And then the subjective reasons that we talked about, the suit jacket and the memo and so forth, those were not reasons put forth in the rejection letter that Jeffries got. Those were after-the-fact litigation positions that the agency asserted. And finally, Rule 56D motion was not generic. It was specific to the things we felt we needed to find out about with depositions and documents to prove our case. Thank you.
judges: Pillard, Wilkins, Rao